IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

               Plaintiff,

     Vs.                       No.  02-40069-01/02/03-SAC

TERENCE COOPER,
FRANK D. HECK, and
PAIGE A. HECK,

               Defendants.

MEMORANDUM AND ORDER

       The case comes on for sentencing of the three defendants following the jury's guilty verdict returned November 24, 2003.  At the request of the parties, the court continued this sentencing until after the Supreme Court's anticipated decisions in the *Booker* and *Fanfan* appeals concerning the applicability of *Blakely v. Washington*, 542 U.S. 296, 124 S. Ct. 2531 (2004), to the United States Sentencing Guidelines.  With the issuance of *United States v. Booker*, 543 U.S. 220, 125 S. Ct. 738 (2005), the court scheduled dates for the filing of sentencing memoranda and for a sentencing hearing.  The parties filed voluminous and extensive sentencing memoranda in support of their numerous objections to the

PSRs.  Based on those filings, the court expected the sentencing hearing would include the parties' supplementing their positions with lengthy presentations of evidence and argument.  For those reasons, the court did not follow its usual practice of filing proposed rulings or findings in advance of the hearing.  At the sentencing hearing, the parties offered streamlined presentations of testimony, statements and arguments which completed the sentencing record.  Taking all these matters under advisement, the court pored over the parties' contentions and evidence, the circuit precedent emerging from *Booker*, the trial record, and the post-*Booker* climate of sentencing in fraud cases.  The court now issues the following as its decision on the unresolved objections to the presentence reports ("PSR") pursuant to Fed. R. Crim. P. 32(i)(3) and as its statement of reasons pursuant to 18 U.S.C. §  3553(c).

### *BOOKER/BLAKELY* ISSUES AND CONCERNS

In *United States v. Booker*, 543 U.S. 220, 125 S. Ct. 738, 756 (2005), the Court "reaffirm[ed its] holding in *Apprendi*:  Any fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt."  Thus, the Court determined that the mandatory enforcement of the United States

2

Sentencing Guidelines violates the Sixth Amendment "when judge-found facts, . . ., are employed to enhance a sentence." *United States v. Gonzalez-Huerta*, 403 F.3d 727, 731 (10th Cir.) (*en banc*), *cert. denied*, 126 S. Ct. 495 (2005). To keep this unconstitutional scenario from recurring, the Court severed, in part, the provision of the Sentencing Reform Act (18 U.S.C. § 3553(b)(1)) which made the guidelines mandatory. *Booker*, 125 S. Ct. at 756. The sentencing guidelines now are "effectively advisory." 125 S. Ct. at 757. The Act still "requires a sentencing court to consider Guidelines ranges, *see* 18 U.S.C.A. § 3553(a)(4) (Supp. 2004), but it permits the court to tailor the sentence in light of other statutory concerns as well, *see* 3553(a) (Supp. 2004)." *Id.* Put another way, sentencing courts, "while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing. *See* 18 U.S.C.A. §§ 3553(a)(4), (5) (Supp.2004)." *Id.* at 767.

The wake of *Blakely* left the federal district courts tossing about the uncertain waters of guideline sentencing and looking for moorings to ride out the gathering storms. Now with *Booker* in hand, the district courts have, at least, a compass, for their ongoing passage through waters and territories in which many serious and substantial issues are lurking just below the surface. Fortunately, other courts have begun charting those waters and it is on the paths coursed by their

3

work that this court will set its procedural compass and navigate its rulings.

By the terms of 18 U.S.C. § 3553(a), the court must arrive at and "impose a sentence sufficient, but not greater than necessary, to comply with the purposes of sentencing set forth" here:

> (2) the need for the sentence imposed–
> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).  In doing so, the court is called upon by statute to consider these other relevant factors:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> . . . .
> (3) the kinds of sentences available;
> (4) the kinds of sentence and the sentencing range established for--
> (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . . ;
> (5) any pertinent policy statement . . . [issued by the Sentencing Commission];
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
> (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).  Thus, § 3553(a) instructs a sentencing court to consider the established guideline sentencing range, listed as (4), as one of the statutory factors

relevant in arriving at sentencing. "Henceforth, courts are still required to consider the Guidelines in determining sentences, but they are not required to impose a sentence within the Guidelines range." *United States v. Gonzalez-Huerta*, 403 F.3d at 731 (citation omitted).

The defendants raise several issues concerning the application of *Booker* to their sentencings. First, they argue that the Sixth Amendment as applied in *Booker* requires that their sentences be predicated exclusively on the facts as were decided by the jury and reflected in its verdict. Because the offenses were committed when the guidelines were being applied as mandatory, the defendants contend their right to due process would be violated if sentenced to a term of imprisonment exceeding the mandatory guideline range as calculated in conformance with their Sixth Amendment right. If the court resorts to consulting the guidelines as advisory, the defendants ask for a standard of proof of beyond a reasonable doubt for any guideline enhancement or adjustment advocated by the government.

The defendants lodge general and specific objections to any increase in their advisory guideline sentencing ranges based on judge-found facts as a violation of their Sixth Amendment right. The defendants' position requires nothing less than reading and applying *Booker's* Sixth Amendment ruling and

5

ignoring *Booker's* remedial ruling.  The defendants are attempting to resuscitate the

very Sixth Amendment problem uniquely put to rest by the Court's remedial

opinion in *Booker*.  Without the provisions that make the guidelines "mandatory

and impose binding requirements on all sentencing judges–the statute falls outside

the scope of *Apprendi's* requirement."  125 S. Ct. at 764 (quotation marks and

citation omitted).  "In imposing this remedy, the Court specifically rejected defense

suggestions that the Sixth Amendment holding be engrafted on the Sentencing

Guidelines, or that provisions of the Sentencing Guidelines allowing judicial

factfinding be excised."  *United States v. Lynch*, 397 F.3d 1270, 1272 (10th Cir.

2005) (citing *Booker*, 125 S. Ct. at 768-69).  That the defendants were not charged

with the different loss figures and sentencing enhancements and that the jury was

not asked to decide these same matters do not bar this court from engaging in

judicial factfinding for purposes of determining the advisory guideline sentencing

range.  The Supreme Court in *Booker* made it unmistakably clear that not only its

Sixth Amendment ruling but also its remedial opinion is to be applied retroactively

"to all cases on direct review" or those cases not yet final.  125 S. Ct. at 769.  The

defendants' general and specific objections to applying *Booker's* remedial opinion

are overruled.

    The defendants' next attempt at evading *Booker's* remedial opinion is

6

by a constitutional challenge based on *ex post facto* principles inherent in the Due Process Clause.  The defendants rely on Supreme Court precedent which hold that unforeseeable judicial enlargement of a criminal statute, applied retroactively, violates the Due Process Clause, *see Bouie v. Columbia*, 378 U.S. 347 (1964), and *Marks v. United States*, 430 U.S. 188 (1977).  The premise to their argument is that *Booker's* remedial opinion by eliminating the mandatory features of the Act judicially enlarged the guidelines and effectively increased the maximum sentence that may be imposed for a federal offense.  In the defendants' opinion, the maximum sentence is not the top of the guideline range calculated using the mandatory guidelines and judicial factfinding as before *Booker's* Sixth Amendment ruling but rather the top of the guideline range calculated using the mandatory guidelines without judicial factfinding in conformity with *Booker's* Sixth Amendment ruling.  In short, the defendants again seek the benefit of *Booker's* Sixth Amendment ruling unencumbered by *Booker's* remedial ruling.

             The court rejects the defendants' argument.  First, the defendants would have this court presume it has the authority to ignore the Supreme Court's direct statement in *Booker* which plainly spelled out the retroactive reach of its

holding.[1]  Second, underpinning the *Ex Post Facto* clause as incorporated into the

────────────────

[1]The defendants' arguments disregard the Supreme Court's direct statement in *Booker* which spelled out the retroactive reach of its holding:

> As these dispositions indicate, we must apply today's holdings--both the Sixth Amendment holding and our remedial interpretation of the Sentencing Act--to all cases on direct review. *See Griffith v. Kentucky*, 479 U.S. 314, 328, 107 S. Ct. 708, 93 L. Ed. 2d 649 (1987) ("[A] new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases ... pending on direct review or not yet final, with no exception for cases in which the new rule constitutes a 'clear break' with the past"). *See also Reynoldsville Casket Co. v. Hyde*, 514 U.S. 749, 752, 115 S. Ct. 1745, 131 L. Ed. 2d 820 (1995) (civil case); *Harper v. Virginia Dept. of Taxation*, 509 U.S. 86, 97, 113 S. Ct. 2510, 125 L. Ed. 2d 74 (1993) (same).

125 S. Ct. at 769.  This holding necessarily and directly impacts all defendants who would have been convicted of offenses before *Booker*.  Because the defendants here make no effort to distinguish themselves from any other defendant in this situation, the defendants would have this court essentially hold that following the Supreme Court's direct ruling would violate not only their due process rights as well as the due process rights of every such defendant who committed their offenses prior to *Booker*.  This is not an instance where one should interpret the Court's retroactivity language narrowly upon the speculation that the due process question uniquely escaped the Court's attention and was not considered in fashioning the chosen remedy.  Throughout the *Blakely* and *Booker* opinions, the justices have discussed openly and concisely the actual and potential ramifications and consequences presented by the different remedies for this constitutional dilemma.  If due process necessarily foreclosed a maximum sentence greater than that sustained by the jury's verdict, then the Supreme Court had no cause for remanding Fanfan's sentence, for Fanfan had received a sentence lower than that authorized by the guidelines but consistent with the jury's verdict.  The Court instead held that the government and even the defendant could "seek resentencing under the system set forth in today's opinions."  As the Tenth Circuit concisely observed in response to this very same argument, "[w]e decline Defendant's invitation to hold that the Supreme Court ordered us to violate the Constitution." *United States v. Rines*, 419 F.3d 1104, 1106 (10th Cir. 2005) (citation omitted).

Due Process Clause is the "right to fair warning of that conduct which will give rise to criminal penalties," *Mark v. United States*, 430 U.S. 188, 191-92 (1977),[2] *see Rogers v. Tennessee*, 532 U.S. 451 (2001),[3] the defendants, however, fail to articulate how the retroactivity of *Booker's* remedial opinion violates their right to fair warning of what conduct is criminal or of what penalties could be imposed for

———————————

[2]In *Marks*, the defendants on appeal argued that the trial court erred in not instructing on the more favorable definition of obscenity which was the law when they were transporting the allegedly obscene materials and in instructing instead on the definition of obscenity which had been formulated more recently by the Supreme Court in *Miller v. California*, 413 U.S. 15 (1973). The Court held that the Due Process Clauses barred retroactive application of *Miller's* obscenity standards if it resulted in criminal liability for conduct not previously punishable but that constitutional principles found in *Miller* and beneficial to the defendants must be applied. 430 U.S. at 196-97.

[3]Tracing the outline of this due process right back to *Bouie v. City of Columbia*, 378 U.S. 347 (1964), the Court emphasized:

> "Our decision in *Bouie* was rooted firmly in well establish notions of *due process*. (citation omitted). Its rationale rested on core due process concepts of notice, foreseeability, and, in particular, the right to fair warning as those concepts bear on the constitutionality of attaching criminal penalties to what previously had been innocent conduct. (citation omitted). . . . Contrary to the petitioner's suggestion, nowhere in the opinion did we go so far as to incorporate jot-for-jot the specific categories of *Calder* into due process limitations on the retroactive application of judicial decisions.
>
> Nor have any of our subsequent decisions addressing *Bouie*-type claims interpreted *Bouie* as extending so far. Those decisions instead have uniformly viewed *Bouie* as restricted to its traditional due process roots."

*Rogers*, 532 U.S. at 459.

engaging in such conduct.  When they committed their offenses, the defendants were on notice that the United States Code set the maximum terms of imprisonment for the offenses, that these statutory references were considered the legal maximum sentences regardless of guideline calculations, that the mandatory sentencing guidelines required judicial factfinding, and that every circuit court had considered *Apprendi* rights applicable only to statutory maximums not guideline calculations. *See United States v. Duncan*, 400 F.3d 1297, 1307-08 (11th Cir.), *cert. denied*, 126 S. Ct. 432 (2005); *United States v. Gray*, 362 F. Supp. 2d 714, 728 (S.D. W. Va. 2005); *cf. United States v. Rines*, 419 F.3d 1104, 1107 (10th Cir. 2005) ("The only difference between the *Booker* regime under which his sentence is determined and the regime he would have anticipated at the time of his offense is that the guidelines are not mandatory."), *cert. denied*, 2006 WL 37744 (U.S. Jan. 9, 2006) (No. 05-7719).  Unlike the defendants in any of the Supreme Court cases cited by them, the defendants had been fairly warned at the time of their offenses of the potential penalties for their conduct.  "Even prior to the Sentencing Reform Act, the Supreme Court held that a sentencing court had broad discretion to consider information concerning the defendant's life and characteristics, including conduct on which he had not been convicted." *United States v. Magallanez*, 408 F.3d 672, 684 (10th Cir.) (the adoption of the Sentencing Guidelines did not change the

10

sentencing court's discretion, nor does the Supreme "Court's partial invalidation of

the Guidelines in *Booker*" alter this discretion) (citing *Williams v. New York*, 337

U.S. 241, 247 (1949) and *United States v. Watts*, 519 U.S. 148, 149, 152 (1997)),

*cert. denied*, 125 S. Ct. 468 (2005).  On the facts of this case, the claimed surprise

over the Guidelines becoming advisory does not rise to the constitutionally

protected surprise of engaging in conduct that has since become criminal or

become punishable in excess of anticipated penalties.

Due process arguments similar to what the defendants have advanced

here have not enjoyed successes before other courts.  The Tenth Circuit and other

courts have squarely and firmly rejected these challenges.  *United States v. Rines*,

419 F.3d at 1106-07 (the panel did "not tarry long" in rejecting this due process

argument); *see, e.g.*, *United States v. Dupas*, 419 F.3d 916, 919-921 (9th Cir.

2005); *United States v. Lata*, 415 F.3d 107, 110-12 (1st Cir. 2005); *United States

v. Duncan*, 400 F.3d at 1306-08 ("We conclude that Duncan had sufficient warning

to satisfy the due process concerns."); *United States v. Gray*, 362 F. Supp. 2d at

725-28 ("[T]he defendants in the instant case had fair warning of the potential

consequences of their conduct by virtue of the statutory maximums set by the

United States Code."  "[T]he surprise that the defendants may have experienced

when learning that the Guidelines were no longer a mandatory system is not

11

analogous to the surprise experienced by the defendants in *Bouie* and *Marks* . . .

.").  The court finds the reasoning in these decisions sound and convincing.

The defendants' last constitutional objection to post-*Booker*

procedures concerns the standard of proof.  From the premise that *Booker's* Sixth

Amendment ruling recognized the right to trial by jury on sentencing enhancements

and the concomitant obligation on the government to prove those matters beyond a

reasonable doubt, the defendants again want a narrow reading of *Booker's* remedial

opinion as addressing the Sixth Amendment source for the right to a jury trial but

not the Fifth Amendment source for the standard of proof.  The defendants quote

the following footnote six from the dissent of Justice Thomas to *Booker's* remedial

opinion:

> The commentary to § 6A1.3 states that "[t]he Commission believes that use
> of a preponderance of the evidence standard is appropriate to meet due
> process requirements and policy concerns in resolving disputes regarding
> application of the guidelines to the facts of a case." The Court's holding
> today corrects this mistaken belief. The Fifth Amendment requires proof
> beyond a reasonable doubt, not by a preponderance of the evidence, of any
> fact that increases the sentence beyond what could have been lawfully
> imposed on the basis of facts found by the jury or admitted by the
> defendant.

125 S. Ct. at 798. The defendants observe that some district courts have moved to

this heightened standard of proof for all judicial factfinding of sentencing

enhancements.

12

In 1997 the Supreme Court observed that, "The Guidelines state that it is 'appropriate' that facts relevant to sentencing be proved by a preponderance of the evidence, U.S.S.G. § 6A1.3, comment., and we have held that application of the preponderance standard at sentencing generally satisfies due process." *United States v. Watts*, 519 U.S. 148, 156 (1997) (citing in part *McMillan v. Pennsylvania*, 477 U.S. 79, 91- 92 (1986)). The remedial opinion in *Booker* did not excise this provision from the guidelines, nor did it overrule this precedent with regard to the operation of the advisory guideline system.[4] For that matter, there is a convincing basis to believe that by making the guidelines advisory the Court also cured the constitutional objection over the standard of proof, because the maximum punishment now is set by statute. *United States v. Gray*, 362 F. Supp. 2d at 722. Consistent with Supreme Court precedent, recent controlling Tenth Circuit decisions, and persuasive case law from other circuits, this court will continue to employ the same preponderance of evidence standard in making the

---

[4]The *Booker* remedial opinion even cites the *Watts* decision as authority for the assumption that the guideline system in which judges look to the real conduct underlying the conviction would continue. "That is why the Court, for example, held in *United States v. Watts*, 519 U.S. 148 (1997) (per curiam), that a sentencing judge could rely for sentencing purposes upon a fact that a jury had found unproved (beyond a reasonable doubt). *See id.*, at 157." *Booker*, 125 S. Ct. at 760.

required judicial findings under the advisory sentencing guidelines.  *See United States v. Magallanez*, 408 F.3d at 685 ("Applying the logic of *Watts* to the Guidelines system as modified by *Booker*, we conclude that when a district court makes a determination of sentencing facts by a preponderance test under the now-advisory Guidelines, it is not bound by jury determinations reached through application of the more onerous reasonable doubt standard.  In this respect, the prior Guidelines scheme is unchanged by the seeming revolution of *Booker*."); *United States v. Serrata*, 425 F.3d 886, 920 (10th Cir. 2005) (quoting *Magallanez*); *United States v. Mares*, 402 F.3d 511, 519 (5th Cir.)  (Because U.S.S.G. § 6A1.3(b) (2004) remains effective, "[t]he sentencing judge is entitled to find by a preponderance of the evidence all the facts relevant to the determination of a Guideline sentencing range."  This same standard governs the determination of "all facts relevant to . . . a non-Guidelines sentence."), *cert. denied*, 126 S. Ct. 43 (2005); *McReynolds v. United States*, 397 F.3d 479, 481(7th Cir.) ("The remedial portion of *Booker* held that decisions about sentencing factors will continue to be made by judges, on the preponderance of the evidence, an approach that comports with the sixth amendment so long as the guideline system has some flexibility in application."), *cert. denied*, 125 S. Ct. 2559 (2005); *but see United States v. Huerta-Rodriguez*, 355 F. Supp. 2d 1019 1028 (D. Neb.), *aff'd*, 2005 WL

14

3440785 (8th Cir. 2005). The court, however, shares Judge Goodwin's assessment

in *Gray* that the reasonable doubt standard may be one useful tool in assessing the

relative weight of an advisory guideline sentencing range in cases, particularly those

which turn largely on the determination of underlying contested factual issues. 362

F. Supp. 2d at 723-24.

**OBJECTIONS TO GENERAL MATERIAL IN PSR**

**Government's Objection to Inclusion of Ten Investigative Summaries and of
Paige Heck's Responses in her co-defendants' PSRs**.

The government complains that these summaries are a small

percentage of the interviews conducted and that the PSR does not explain its

selection of certain interviews. The government questions the reliance on these

summaries over the testimony introduced at trial or before the grand jury. The

government does not take issue with the accuracy of the information found in the

PSR but reserves its right to assert work product protection. The government also

complains that the PSR for a defendant should not include the related comments or

responses made by co-defendants. The PSR writer responds that these interviews

were selected to furnish the court with a basic background of the facts and

elements relevant in guideline sentence determinations and that co-defendants'

comments were included so the court would have a complete picture of the

different loss theories and approaches when reading each PSR.

      **Ruling**: Rule 32(i)(3)(B) states that "for any disputed portion of the presentence report or other controverted matter" during sentencing, the court must "rule on the dispute or determine that a ruling is unnecessary either because the matter will not affect sentencing, or because the court will not consider the matter in sentencing." This provision makes clear that "controverted matters at sentencing only require a ruling if the disputed matter will affect the eventual sentence." *United States v. Darwich*, 337 F.3d 645, 666 (6th Cir. 2003). The court determines that no ruling is necessary, as the government's objection addresses matters and procedures that will not affect the eventual sentence.

## Government's Objection to Co-Defendant's Verification of Family Data

      The government summarily objects to the PSR of Paige Heck for relying on the interview of Frank Heck to verify personal and family data and objects to the PSR of Frank Heck for relying on the interview of Paige Heck in a similar way.

      **Ruling:** The court summarily overrules the objection.

## Defendant Terence Cooper's Objections to PSR's Statement of Offense Conduct

      The defendant generally objects to the totality of paragraphs ¶¶ 69-257

16

and specifically objects to the PSR omitting certain matters relevant to his good faith defense advanced at trial.  These matters include the defendants' use of other companies for billing and consulting, the defendants' reliance on manufacturers to provide the proper codes for their products, the defendants' reliance on Medicare insofar as the defendants submitted claims that accurately identified and described the products being billed, and the defendants' reliance on Midwest's attorney particularly with regard to financial decisions.  The defendant Cooper also complains that part of the blame for what he describes as inaccurate coding rests with Medicare and its failure to offer a coherent coding system that could account for the obvious qualitative ranges among the different products.

**Ruling**:  "[G]eneralized, perfunctory objections are not specific allegations of factual inaccuracy and are insufficient to controvert a matter such that the district court's fact-finding obligation under Rule 32(c)(1)[5] is invoked." *United States v. Brown*, 314 F.3d 1216, 1226 (10th Cir.) (quotation and citation omitted), *cert. denied*, 537 U.S. 1223 (2003).  The defendant's general objection to the PSR's findings on offense conduct does not trigger any fact-finding requirements.

Not only during trial but at sentencing, the defendant has been

---

[5]This fact-finding obligation is now found at Fed. R. Crim. P.  32(i)(3).

17

afforded opportunities to present the court with evidence concerning his reliance on others in billing Medicare. The defense of good faith reliance was presented at trial, and the jury returned a guilty verdict notwithstanding this defense. In finding the defendant Cooper guilty on all counts, the jury necessarily found beyond a reasonable doubt that at one or more of the times charged in the indictment the defendant did not act on an erroneous or mistaken belief honestly held but acted with the intent to defraud. A jury's verdict and "the facts necessarily implied by that verdict are binding on a court for sentencing purposes." *United States v. Merlino*, 349 F.3d 144, 159 (3rd Cir. 2003) (citation omitted), *cert. denied*, 541 U.S. 965 (2004); *see United States v. Bradstreet*, 135 F.3d 46, 55 (1st Cir.), *cert. denied*, 523 U.S. 1122 (1998). On the other hand, the court understands the jury's verdict does not speak directly to some of the issues critical under the Guidelines and at sentencing. Moreover, the court appreciates after *Booker* the defendant's restored opportunity to present and argue the other § 3553(a) factors in mitigation of his sentence and the court's restored discretion to weigh the same. Consequently, the court will consider the issues and evidence argued at sentencing and those matters presented at trial in support and refutation of the good faith defense insofar as they are shown to be relevant under the different 18 U.S.C. § 3553(a) factors.

18

**Defendant Frank Heck's Objection to ¶ 251**

    The defendant denies offering Lisa McNish a paycheck without any federal or state withholdings and objects that such a statement is irrelevant to the sentencing.

  **Ruling**:  Because the government has not referred to any trial testimony by McNish consistent with this statement, has not offered proof of this statement at the sentencing hearing, and has not established the relevance of this fact to this sentencing, the court sustains the objection.

**Defendant Frank Heck's Objection to Using the 1998 Sentencing Guidelines**

    Though conceding that the conspiratorial acts charged in the indictment continued through December of 1998, the defendant Frank Heck argues that the conduct underlying the substantive charges occurred before December of 1998 and that the 1998 Guidelines Manual added enhancements for mass marketing and sophisticated means which, if applied, would result in ex post facto violations.

  **Ruling**:  Generally, a sentencing court is to apply the Guidelines Manual effective on the date of sentencing rather than the Manual effective at the time of the offense.  U.S.S.G. § 1B1.11(a)(2004).  "'The Ex Post Facto Clause, however, prohibits retroactive application of an amended guideline provision if the amendment disadvantages the defendant'" by inflicting a greater punishment for an

19

offense than the law allowed when the offense was committed. *United States v. Swanson*, 360 F.3d 1155, 1166 (10th Cir. 2004) (quoting *United States v. Orr*, 68 F.3d 1247, 1252 (10th Cir.1995), *cert. denied*, 516 U.S. 1064 (1996)). Thus, if the use of the Guidelines Manual effective on the date of sentencing would violate the ex post facto clause, a court must use the Guidelines Manual effective when "the offense of conviction was committed." U.S.S.G. § 1B1.11(b)(1)(2004). Under the "one-book" rule, a defendant may not select provisions from different Guideline Manuals in order to secure the lightest sentence. *United States v. Aptt*, 354 F.3d 1269, 1276 (10th Cir. 2004).

The defendant Heck does not dispute that using the current Guideline Manual would violate the ex post facto clause, but he does challenge the conclusion that it is the 1998 Guidelines Manual rather than the 1997 Guidelines Manual that was effective when "the offense of conviction was committed." Application Note 2 to § 1B1.11 clarifies that "[u]nder subsection (b)(1), the last date of the offense of conviction is the controlling date for ex post facto purposes." U.S.S.G. § 1B1.11, comment. (n. 2). More specifically, the last date of the offense alleged in the indictment of which a defendant is convicted is the controlling date for ex post facto purposes. U.S.S.G. § 1B1.11, comment. (n.2); *see United States v. Gary*, 291 F.3d 30, 36 (D.C. Cir. 2002); *United States v. Broderson*, 67 F.3d 452, 456

20

(2d Cir. 1995).  If a defendant is convicted of more than one crime, with one or
more committed before a revised edition of the Guidelines becomes effective and
the rest occurring after the effective date, the revised edition is applied to all of the
offenses.  *See* U.S.S.G. § 1B1.11(b)(3); *United States v. Sullivan*, 255 F.3d 1256,
1260 (10th Cir. 2001) (upholding the validity of this Guideline provision as applied),
*cert. denied*, 534 U.S. 1166 (2002).  Conspiracy is a continuing offense, "the
ending date of which determines the applicable sentencing guidelines."  *United
States v. Sullivan*, 255 F.3d at 1263.

        Count one of the first superseding indictment charges the defendants
with a conspiracy that continued through December of 1998 and further alleges
certain unlawful transfers of monies as occurring after November 1, 1998.  Because
it became effective November 1, 1998, the 1998 Guidelines Manual was effective
when "the offense of conviction was committed."  The defendant's objection to
using the 1998 Guidelines Manual is overruled, and his other ex post facto
objections will be addressed, if necessary, in the court's discussion of the specific
enhancements.

**Defendant Paige Heck's Objections to Paragraphs 69, 76, 79, and 84**

        She objects to ¶ 69 for omitting a reference to the jury's finding of not
guilty on counts 2, 3, 4, 5, 6, 17 and 18.  She objects to ¶ 76 for describing the

wheelchairs provided in the upcoding scheme as "inexpensive" rather than less expensive.  She objects to ¶ 79 and denies involvement in Infinity Medical Supply or Infinity Medical Products.  She objects to ¶ 84 for not mentioning that the defendants hired consulting services to advise them on Medicare rules and regulations.

**Ruling**:  Only the defendant's objection to ¶ 79 controverts a statement found in the PSR, but it is not a controverted matter that will affect the sentencing here or will be considered in sentencing.  Thus, no ruling is necessary.  The defendant's other objections also do not require a ruling.  The court is mindful of not only the jury's verdict but also the evidence admitted at trial.  The court also agrees that Midwest provided wheelchairs which were less expensive rather than inexpensive.

**CALCULATION OF LOSS OBJECTIONS**

All four parties have filed numerous and varied objections to the loss calculations appearing in the PSR.  Rather than extending the length of this order by laying out each of the different objections and responses thereto and then ruling separately on each objection, the court will focus principally on the common issues advanced in the different objections and decide the issues accordingly.  The parties should be able to discern the court's treatment of the specific objections from its

general rulings and the principals endorsed in them.

Under the Sentencing Guidelines, the offense level for a crime of fraud is driven by the dollar value of the loss caused by the criminal conduct. The purpose of the loss calculation is to reflect "the magnitude of the crime at the time it was committed" and thereby the defendant's culpability. *United States v. Nichols*, 229 F.3d 975, 979 (10th Cir. 2000). Application Note 8 to § 2F1.1 of the 1998 Sentencing Guidelines provides that "loss" is "the value of the money, property or services unlawfully taken" but "if an intended loss that the defendant was attempting to inflict can be determined, this figure will be used if it is greater than the actual loss." From what is generally argued, the parties apparently agree that loss here should be determined under the concept of actual loss, that is, "'the amount of money the victim has actually ended up losing at the time of sentencing, not what it could have lost.'" *United States v. Schild*, 269 F.3d 1198, 1201 (10th Cir. 2001) (citation and quotation omitted), *cert. denied*, 535 U.S. 944 (2002).

In determining loss under U.S.S.G. § 2F1.1(b)(1), the sentencing court "is not necessarily limited to the funds identified with the crime charged in the indictment, or which resulted in a judgment of guilty." *United States v. Yarnell*, 129 F.3d 1127, 1137 (10th Cir. 1997) (quoting *United States v. Kunzman*, 54 F.3d 1522, 1532 (10th Cir. 1995)). The sentencing guidelines include as relevant

conduct that which was reasonably foreseeable and in furtherance of the jointly

undertaken criminal activity.  U.S.S.G. § 1B1.3(a)(1).  The Tenth Circuit recently

summarized:

> A defendant convicted of conspiracy is accountable for reasonably
> foreseeable conduct in furtherance of the jointly undertaken criminal activity.
> *See* U.S.S.G. § 1B1.3(a)(1)(A).  However, a defendant's accountability only
> extends to the criminal activity that he agreed to undertake.  *See id.* § 1B1.3
> n.2.  This means "proper attribution at sentencing requires . . . particularized
> findings about, the scope of the specific agreement the individual defendant
> joined in relation to the conspiracy as a whole."  *United States v. Melton*,
> 131 F.3d 1400, 1404 (10th Cir. 1997) (internal quotation marks omitted).  In
> the context of a conspiracy to defraud, we have held that a defendant is
> accountable for the entire loss created by a fraudulent organization if the
> defendant played a major role in the organization and the losses were
> reasonably foreseeable. *See United States v. Osborne*, 332 F.3d 1307,
> 1311-12 (10th Cir. 2003).  If the defendant's role in the conspiracy was less
> substantial, then particularized findings about the defendant's agreement to
> join the conspiracy must support the scope of the defendant's role in the
> conspiracy. *See Melton*, 131 F.3d at 1406.  Moreover, a defendant is not
> accountable for the conduct of members of a conspiracy "prior to the
> defendant joining the conspiracy, even if the defendant knows of that
> conduct."  U.S.S.G. § 1B1.3 n.2.

*United States v. Dazey*, 403 F.3d 1147, 1176-1177 (10th Cir. 2005).

The burden of proving the amount of loss rests with the government

which is seeking this sentencing enhancement.  *United States v. Nichols*, 229 F.3d

at 979.  This burden entails offering proof of the enhancement by a preponderance

of the evidence.  *United States v. Keifer*, 198 F.3d 798, 800 (10th Cir. 1999).  As a

general rule, the government bears the burden of proof for a sentence increase, and

24

the burden shifts to the defendant to prove any decrease in sentence.  *United States v. Rice*, 52 F.3d 843, 848 (10th Cir. 1995); *United States v. Rutter*, 897 F.2d 1558, 1560 (10th Cir. 1990).  Thus, if the government meets its burden of proof on a sentence enhancement or increase, the burden shifts to the defendant to disprove the same as inapplicable or inappropriate.  *United States v. Maldonado*, 216 F.3d 1089, 2000 WL 825717 at *3 (10th Cir. 2000).

The court may rely on facts appearing in the PSR to which no objection is lodged and on those facts subsequently proved by the government. *United States v. Keifer*, 198 F.3d at 800.  When there has been a trial, the government may rely on the trial evidence and need not present any new evidence at the sentencing hearing.  *United States v. Albers*, 93 F.3d 1469, 1487 (10th Cir. 1996).  Having presided over the trial, the court is familiar with the evidence admitted at trial and will rely on its recollection and impression of the same without disturbing the general findings embodied in the jury's verdict.  *cf. United States v. Diaz*, 189 F.3d 1239, 1250 (10th Cir. 1999), *cert. denied*, 529 U.S. 1031 (2000). The determination of loss is not one that requires precision, for a reasonable estimate based on available evidence is sufficient.  *United States v. Wells*, 127 F.3d 739, 748 (8th Cir. 1997).

Section 2F1.1 of the 1998 Guidelines identifies different factors related

to the kind of fraud that will influence the determination of the loss in a particular

case. "[W]here the commentary to the applicable section of Chapter Two includes

several application notes that describe alternative methods of computing the offense

level depending on the particular facts of the case, the sentencing court should

choose the "most applicable" application note." *United States v. Wells*, 127 F.3d

at 745. For fraud involving the misrepresentation of the value of an item or

product, application note 8(a) provides:

> A fraud may involve the misrepresentation of the value of an item that does
> have some value (in contrast to an item that is worthless). Where, for
> example, a defendant fraudulently represents that stock is worth $40,000 and
> the stock is worth only $10,000, the loss is the amount by which the stock
> was overvalued (*i.e.*, $30,000). In a case involving the misrepresentation
> concerning the quality of a consumer product, the loss is the difference
> between the amount paid by the victim for the product and the amount for
> which the victim could resell the product received.

For fraud involving loan applications, application note 8(b) provides:

> In fraudulent loan application cases and contract procurement cases, the loss
> is the actual loss to the victim (or if the loss has not yet come about, the
> expected loss). For example, if a defendant fraudulently obtains a loan by
> misrepresenting the value of his assets, the loss is the amount of the loan not
> repaid at the time the offense is discovered, reduced by the amount the
> lending institution has recovered (or can expect to recover) from any assets
> pledged to secure the loan. However, where the intended loss is greater than
> the actual loss, the intended loss is to be used.

As discussed below, the court finds these two application notes to be the most

applicable here in calculating the health fraud loss and the mail fraud loss,

respectively.

*Health Care Fraud Losses*

The government posits that the losses attributable to the defendants'

health care fraud exceed $5.6 million combining the $3,504,520.23 used in the PSR

as representing the documented[6] fraud loss and the $2,187,843.84 not used in the

PSR but representing the undocumented[7] fraud loss.  According to the

government's investigation, when Midwest was in business it submitted billings that

totaled $10,124.703.57 of which Medicare paid $4,725,083.62 for claims for power

wheelchairs, power wheelchair accessories, and wheelchair cushions or eighty

percent of $5,906,354.52.  The government proposes as its theory that the health

care fraud loss is the total amount of all submitted claims which either contain an

---

[6]The PSR states that agents located 860 Midwest patient files representing
1,240 claims for power wheelchairs and wheelchair cushions.  The agents
documented that all of these claims were upcoded, that is, included billings  for
more expensive items than actually provided.  These claims were accompanied by
additional line items for accessories.  All of these claims represent $4,124,801.63
billed to Medicare.  Medicare paid $2,803,616.19 on these claims which is 80% of
$3,504,520.23.  Thus, the PSR calculates loss to be the total amount of those
claims documented as containing an upcoded item.

[7]This figure represents the billings for power wheelchairs and cushions to
Medicare that total $2,777,583.56 of which Medicare paid $2,187,843.84.  The
government represents that agents did not find patient files or found only
incomplete patient files for these claims and that Medicare should not have paid
these claims because the documentation maintained by the defendants was not
sufficient to support a claim.

upcoded item or lack the supporting documentation required by Medicare

regulations.  The government premises this theory on Medicare's practice and

procedure of denying an entire claim if it knows that any part of the claim was false

or upcoded or if it learns that supporting documentation does not exist.  In support

of this position that loss equates most nearly with the total of Midwest's submitted

claims, the government points to Medicare audits first done while Midwest was in

business and again conducted following the convictions in this case and to the one

hundred percent denial rates consistently recommended in each.

       The defendants repeat several of their *Booker*-type challenges to the

loss calculations, all of which are denied for the same reasons discussed above.

The defendants further contend the loss calculations adopted in the PSR and those

loss calculations also advocated by the government are contrary to the net loss

approach followed in this circuit for the 1998 version of the Sentencing Guidelines.

Since Midwest's patients received durable medical equipment, the defendants say

that a net loss approach is appropriate and that this loss should include only what

Medicare overpaid as result of the unlawful upcoding of wheelchairs and wheelchair

cushions.  Relying on the government's spreadsheet and what is alleged in the

indictment, the defendants begin with the overpaid amount of $642,973 and then

assert the deletion of some categories from this amount.  The defendant Cooper

28

wants to exclude the overpayments for the 98  P7E wheelchairs provided between September of 1996 through October of 1997, because Medicare did not publish a code for this wheelchair in its manuals and did not tell the wheelchair manufacturer of an assigned code until September of 1997.  As the jury's verdict does not include any specific finding that Midwest's billing of the P7Es during this period was fraudulent, the defendant Cooper asks the court to treat this overpayment loss as attributable to possibly civil or regulatory violations but not criminal in character. The defendant points to some overpayments as attributable to billing companies' errors rather than Midwest's alleged criminal conduct but admits these documented instances of error are negligible and would not affect base offense level determinations.[8]  The defendant Paige Heck seeks to reduce the amount of overpayments by the loss amounts charged in those counts of which she was acquitted.

As spelled out in application note eight to U.S.S.G. § 2F1.1, "loss is the value of the money, property, or services unlawfully taken."  The principal allegation of fraud on which this case was prosecuted was that the defendants

---

[8]Because a finding on the amount of upcoding attributable to billing company errors would not affect the base offense level, the court determines that its ruling is unnecessary.  *See* Fed. R. Crim. P.  32(i)(3)(B).

coded less expensive wheelchairs and wheelchair cushions as if they were the more

expensive versions.[9]  In other words, the defendants were charged with and

_____

[9]It is quite true that the government alleged additional fraudulent schemes in its lengthy indictment and offered some evidence with regard to those billing practices in an effort to paint Midwest as a sham durable medical equipment provider.  At the conclusion of the evidence, no party asked the court for a verdict form that would have required the jury to make specific findings on the different offenses that were the subject of the conspiracy or on the different manner or means that were charged as part of the scheme to defraud for the individual health care fraud counts.  Indeed in both contexts, the jury was instructed that the government need not prove each of the alleged alternatives and that the jury need only agree unanimously on at least one such alternative.  Thus, in the absence of these findings or a specific finding of loss from the jury, one cannot reasonably infer from the verdict that the defendants were necessarily found guilty of having engaged in the full range of health care fraud as charged.

The government would have the court decide that the defendants engaged in all of the alleged manner and means and submitted no legitimate claims for reimbursement and then hold the defendants accountable by concluding that the total amount of submitted claims represent the losses attributable to this alleged conduct.  The court, however, declines to do so for several reasons.  The government's proof has not persuaded the court that Medicare was unwilling to pay for the durable medical equipment supplied because Midwest's patients were not intended beneficiaries under the Medicare program.  *See United States v. Frost*, 281 F.3d 654, 659-60 (7th Cir. 2002).  The government's proof has not persuaded the court that the defendants acted with the intent to defraud when they engaged in such alleged manner and means as mishandling the certificates of medical necessity, billing of equipment prior to delivery, and billing separately for wheelchair batteries.  In the government's judgment, all regulatory violations committed by Midwest can be assumed to have resulted from the defendants' same fraudulent intent behind their upcoding.  The court's impression of the evidence is different.  While the evidence certainly showed that the defendants at some point in time did intentionally upcode the wheelchairs and wheelchair cushions and billed for certain cushions which were unnecessary for certain wheelchairs, the evidence was also quite convincing in showing that the defendants were not careful business people and

convicted of fraudulently misrepresenting the value or quality of these delivered

products by submitting claims with codes reserved for the more expensive versions

of the same products.  Application note eight to § 2F1.1 identifies an analogous

situation of determining loss when the value of an item has been fraudulently

_____

were uninformed or ill-informed in some instances about what they could or could
not do under what plainly is a myriad of complex and confusing governmental
regulations.  The court's impression comes from its consideration of all the
evidence admitted at trial and believes its impression is confirmed by the audits
done on Midwest's submitted claims and the multitude of technical grounds
identified there for denying Midwest's different claims.  In addition, the defendants
cite a recent government report that a significant number of suppliers' claims fail to
comply with all of Medicare requirements.  Nor was the court persuaded by the
evidence at trial that the defendants repeatedly billed for products without concern
for patients' needs.  The court rejects as unproved the government's allegations of
a criminal intent sweeping through all of the defendants' sloppy business practices
when these same defendants enjoyed long and close ties to their community,
employed friends and family, and later opened their books to third parties trying to
secure additional capital and to expand and diversify their business involvement in
the community.  The defendants' actions do not bespeak of widespread fraud for
which this court should summarily reject all of Midwest's claims as illegitimate
submissions from a so-called "Medicare Mill."  In the exercise of its discretion and
based on the evidence at trial, the court finds that the loss calculations for health
care fraud should be limited to the upcoding of wheelchairs and wheelchair
cushions and the unnecessary billing of certain cushions for wheelchairs with
cushioned seats.  Thus, the court will limit the loss calculations for health care fraud
to this criminal activity.  *See United States v. Abud-Sanchez*, 973 F.2d 835, 838-39
(10th Cir. 1992); *cf. United States v. Jaramillo*, 98 F.3d 521, 525-26 (10th Cir.),
*cert. denied*, 519 U.S. 1000 (1996).  As will be discussed later in this order under
the different § 3553(a) considerations, the court believes that even this loss figure
may overstate when the defendants' upcoded billings were actually the result of a
criminal intent.

misrepresented:

> A fraud may involve the misrepresentation of the value of an item that does
> have some value (in contrast to an item that is worthless).  Where, for
> example, a defendant fraudulently represents that stock is worth $40,000 and
> the stock is worth only $10,000, the loss is the amount by which the stock
> was overvalued (*i.e.* $30,000).

This method for determining loss is not unlike the net loss approach adopted by the

Tenth Circuit in *United States v. Smith*, 951 F.2d 1164 (10th Cir. 1991):

> Our approach thus distinguishes between naked fraudulent takings,
> and exchanges of property where the wrongdoer merely misrepresents the
> value of the consideration advanced.  If a fraud is a naked taking of property,
> the net and gross loss are the same since the victim got nothing of value in
> return for the property given up.  However, if the fraud consists of an
> unequal exchange of property, the loss or taking consists only of the
> *difference* in value between what was given and what was obtained.  In any
> event, it is a *net* value that must be used to measure loss.  Any other
> approach ignores reality. . . .  A thief who steals $100,000 is more culpable
> than a salesman who obtains $100,000 by selling a victim an $80,000 house
> he fraudulently represents as being worth $100,000.  In the latter case, it
> makes no sense to suggest that $100,000 is the accurate measure of the
> victims's loss.

951 F.2d at 1167 (citations omitted).  Other than some allegations of isolated

instances when Medicare may have been billed twice for equipment, the evidence at

trial did not prove that Midwest submitted claims for equipment that was never

delivered to Medicare beneficiaries.

Citing a decision from Fifth Circuit,[10] the government contends the net loss approach advocated by the defendants was a substantive amendment to the Guidelines first adopted in 2001 which cannot be applied retroactively without violating the "one book" rule.  The weight of Tenth Circuit case law[11] eviscerates the government's position, for the net loss or net value approach was consistently followed in this circuit for pre-2001 versions of the Guidelines.  The Tenth Circuit precedent is emphatic on this point:  "Any other approach ignores reality."  *United*

---

[10]*United States v. Caldwell*, 302 F.3d 399, 418 (5th Cir. 2002).

[11]For "fraud-type offenses" governed by U.S.S.G. § 2F1.1, sentencing courts in calculating loss "should use 'the net value, not the gross value, of what was taken.'"  *United States v. Gennuso*, 967 F.2d 1460, 1462 (10th Cir. 1992) (quoting *United States v. Smith*, 951 F.2d 1164, 1167 (10th Cir. 1991)).  The Tenth Circuit cases calculated "net loss by subtracting the value of what was given to the victim(s) *during the course of the transaction* from the value of what was fraudulently taken."  *United States v. Pappert*, 112 F.3d 1073, 1079 (10th Cir. 1997).  The court in *Pappert* cited the following in support of that rule:

> "*See, e.g., Smith*, 951 F.2d at 1167 (subtracting security interest given in exchange for fraudulently attained loans); *Gennuso*, 967 F.2d at 1462 (subtracting value received from amount victim paid in a fraudulent marketing scheme); *United States v. Reddeck*, 22 F.3d 1504, 1513 (10th Cir.1994) (remanding to district court to subtract value, if any, of education from tuition paid, where students were fraudulently informed about accreditation of university).

112 F.3d at 1079 *cf. United States v. Frost*, 281 F.3d 654, 659 (7th Cir. 2002) ("The Guidelines call for the use of net rather than gross loss (for example, a defendant receives credit for the value of goods delivered, if the fraud entails overcharging).") (applying 2000 Guidelines and citing U.S.S.G. § 2F1.1 Application Note 8).

*States v. Smith*, 951 F.2d at 1167.

The government attempts to distinguish this precedent arguing that the net loss approach arose from the bank fraud context and that the defendants cite "no health care fraud cases that adopt" this net loss approach.  By the same token, the government does not cite any cases that limit the net loss approach to the bank fraud context or that refuse to apply this approach to government benefit fraud case subject to pre-2001 versions of the Guidelines.[12]  The government makes the sweeping allegation that the defendants "submitted no legitimate claims to Medicare" but bases its allegation of illegitimacy not on whether defendants provided anything of value but on whether the defendants complied with

_____

[12]Applying pre-2001 versions of the guidelines, other circuit courts have recognized the net loss approach in calculating loss for fraud convictions involving government benefit programs.  *See, e.g.*, *United States v. Frost*, 281 F.3d 654, 659 (7th Cir. 2002);  *United States v. Rutgard*, 116 F.3d 1270, 1294 (9th Cir. 1997).  In *Frost*, the court observed:

> "When one party sets out to benefit another, then the net loss is the cost to the payor less the benefit delivered to the intended recipient.  So in a food stamp case, where the grocer accepts stamps for both breach (allowed) and liquor (prohibited), the net loss to the United States is the amount of stamps redeemed, less the value of eligible items delivered to the beneficiaries. *United States v. Hassan*, 211 F.3d 380 (7th Cir. 2000); *United States v. Barnes*, 117 F.3d 328 (7th Cir. 1997).  The same principle allows educators to deduct from the gross loss the value of any education for which the United States was willing to pay."

281 F.3d at 659.

34

Medicare's numerous regulations for submitting claims.  As discussed in footnote nine, this court believes the government's allegations and arguments on loss are not narrowly focused on measuring the defendants' criminal culpability but seek to hold the defendants' criminally accountable for ineptitude and carelessness in preparing, documenting and submitting claims in compliance with Medicare's complex regulatory requirements.  Of the different methods for determining loss outlined in the application notes to U.S.S.G. § 2F1.1, the misrepresentation of value is the most appropriate method as this is what the defendants did in upcoding the equipment sold to Medicare beneficiaries.  The government advocates using the approach "involving the diversion of government program benefits" with loss being "the value of the benefits diverted from intended recipients or uses."  The government's authorities are distinguishable and not persuasive.[13]  On the facts

_____

[13]While Medicare certainly is a government benefit program, this is not a case in which the government has proved that the supplied devices were "medically unnecessary" and, therefore, nothing of value was conveyed, *see, e.g., United States v. Aginsky*, 165 F.3d 15, 1998 WL 777759 (2nd Cir. 1998) (unpublished), nor is this a case in which the defendants were disqualified from participating in Medicare and Medicaid programs but received benefits under those programs that were fraudulently diverted from qualified providers, *see, e.g., United States v. Nastasi*, 2002 WL 1267995, at *3-*4 (S.D.N.Y. Apr. 17, 2002) (unpublished), nor is this a case in which the defendant billed for services fraudulently certifying that it had performed services which were actually performed by another billing supplier, *United States v. NHML, Inc.*, 225 F.3d 660, 2000 WL 420683 (6th Cir.), *cert. denied*, 531 U.S. 827 (2000).

unique to this case and on the weight of Tenth Circuit precedent governing the use of the pre-2001 Guidelines, the court concludes the net loss approach is applicable and appropriate here and sustains the defendants' objection in part.

The court, however, overrules the defendants' objection to including the upcoding attributable to the 98 P7E wheelchairs billed prior to Medicare's publication of a code assignment for this particular model of wheelchair.  The defendants argue that "one cannot upcode when there is no code."  The defendants' own testimony at trial refutes the argument that Medicare's delay in publishing a code assignment caused them to upcode the P7Es.  *See* (Dk. 341, Cooper Testimony, pp. 54-57).  The record at trial and the arguments in the defendants' sentencing memoranda do not convince the court that the defendant's coding decision on the P7Es was the result of the delayed code assignment.  This reason is not a persuasive basis for excluding the loss attributable to the 98 P7Es.

The defendant Paige Heck objects to including the loss alleged in counts two through six of which she was acquitted.  In a conspiracy to defraud, the court may hold a defendant accountable "for the entire loss created by a fraudulent organization if the defendant played a major role in the organization and the losses were reasonably foreseeable."  *United States v. Dazey*, 403 F.3d at 1176 (citation omitted).  The evidence at trial fully sustains a finding by a preponderance of the

36

evidence that Paige Heck's role was substantial in the fraudulent organization and that the losses alleged in those counts were reasonably foreseeable to her. While each defendant was principally responsible for different aspects of Midwest's business, they frequently met together, discussed each other's operations, and jointly decided the more important matters involving Midwest's business. The evidence at trial establishs that Paige Heck knew of the upcoding and despite her role and authority in the business permitted it to continue. The court overrules Paige Heck's objection to including the losses alleged in counts two through six.

Thus, the court finds that the net loss to Medicare from the health care fraud is the $642,972.82 alleged in the indictment and proved at trial by the government. Of course, this figure represents only eighty percent of the billed purchase price, and the court must include in that loss the additional twenty percent billed to patients or third-party insurers who were liable for this amount under the Medicare program and contracts with Midwest. This calculated loss is $803,716.02. The court believes this figure fairly and adequately represents the harmfulness and seriousness of the defendants' conduct. The court does not find an upward departure warranted by the government's allegation of a loss of confidence in the Medicare system created by the defendants' criminal conduct.

*Wire Fraud Loss*

37

The government here seeks a total loss of $2,141,774.37 corresponding to Midwest's consent to judgment that resolved the civil lawsuit brought by Invacare Corporation. As there can be any number of circumstances and factors that drive parties to reach a settlement, some of which would have nothing to do with the actual loss sustained by the fraud victim, the court declines the government's proposal simply to accept the settlement amount as a reliable measure of the actual loss resulting from the defendants' wire fraud for which they were convicted in counts fourteen and fifteen.

Count fourteen charged the defendants with wire fraud against Invacare in executing and transmitting personal guaranties on May 4, 1998. Loss is that amount of money lost by the victim which is "attributable to" a defendant's fraud. *United States v. Haddock*, 12 F.3d 950, 961 (10th Cir. 1993). According to the testimony of Invacare representatives, these personal guaranties did not influence Invacare's decision to open Midwest's credit line or to extend it on any number of occasions even when it reached $1.6 million just before May of 1998. After receiving the guaranties, Invacare released Midwest's open order, took Midwest's accounts off of credit hold, and completed negotiations on the commercial purchase agreement #9558. The parties have not pointed the court to evidence with which to quantify the value of the product released as a result of the

38

personal guaranties, and the record does not suggest that it was a significant amount of product, over $100,000.00. As far as count fifteen, the defendants were convicted of wire fraud against Invacare in executing and transmitting the commercial purchase agreement #9558. The face amount of this short term note was nearly $600,000. Thus, the court determines the actual loss for the wire fraud committed in these two counts is $600,000 and accordingly sustains the defendants' objections and overrules the government's objections.[14]

Totaling the fraud loss for counts one through fifteen, the court arrives at approximately $1.4 million ($803,716.02 plus $600,000) for an offense level of 17 (base offense level of 6 plus an enhancement of 11 levels for a loss of more than $800,000 but less than $1.5 million).

---

[14]The government here again alleges the defendants opened the doors of Midwest with the intent to defraud all with whom they would do business. "[T]he defendants' scheme against Invacare started from the beginning of their business relationship. This was the government's theory and its proof." (Dk. 354, pp. 30-31). That was the government's theory but its evidence did not prove these sweeping allegations. The court believes the evidence more accurately shows inexperienced business persons who were overwhelmed with their immediate and unexpected growth and who were looking to expand and diversify their business holdings. When their investments left them overextended and exposed, the defendants engaged in a scheme to defraud Invacare through several misrepresentations about their intentions and ability to repay. The court believes a loss figure based on the last commercial purchase agreement fairly represents the harm attributable to the defendants' fraudulent misrepresentations.

39

*Money Laundering Loss*

The court sustains the defendants' objections to any money laundering loss in excess of the loss calculated above as resulting from the health care fraud. Thus, the court reduces the loss from $1,515,440.02 to $803,716.02 and reduces the loss enhancement from five to four.

## OBJECTIONS TO OTHER ENHANCEMENTS

### Government's Objection to Omission of Mass Marketing Enhancement

The government objects that the defendants should receive a two-level enhancement for mass marketing pursuant to § 2F1.1(b)(3) based on their advertising of Midwest's products in newspapers across the country. The government points to sample newspaper advertisements for a "Senior Wheels Program" with a toll-free number for a "mobility needs" visit that connected callers to Midwest's offices. Information obtained during those calls was forwarded to area sales representatives who then made sales visits to the callers' homes. The government also cites Midwest's own description of its marketing program which touted that "the vast majority of Midwest's customer base (approximately 90%) contact the company's office or a local representative in response to nationwide print media campaigns." (Dk. 354, p. 34). The defendant Frank Heck objects that the government has not proved the defendants ran any of the newspaper

40

advertisements after November 1, 1998, the effective date of the guideline amendment that added the mass-marketing enhancement.

**Ruling**:  Section 2F1.1(b)(3) provides for a two-level increase "[i]f the offense was committed through mass-marketing."  The guidelines commentary defines mass-marketing as "a plan, program, promotion, or campaign that is conducted through solicitation by telephone, mail, the Internet, or other means to induce a large number of persons to (A) purchase goods or services; (B) participate in a contest or sweepstakes; or (C) to invest for financial profit." U.S.S.G. § 2F1.1 comment. (n. 3).  The enhancement reaches passive advertising of goods or services through such mass-marketing means as the Internet or newspapers that reach a large number of persons in order to solicit or induce them to become customers/victims in the scheme to defraud.  *See, e.g.*, *United States v. Magnuson*, 307 F.3d 333, 335 (5th Cir. 2002) (advertisement in a tabloid newspaper), *cert. denied*, 537 u.S. 1178 (2003); *United States v. Blanchett*, 41 Fed. Appx. 181, 182-83, 2002 WL 511745 (10th Cir. Apr. 5, 2002) (advertisements on eBay); *United States v. Pirello*, 255 F.3d 728, 732 (9th Cir.), *cert. denied*, 534 U.S. 1034 (2001) (advertisements on Internet bulletin board).  Some of the concerns underlying this enhancement may be to measure the scope of a defendant's fraudulent scheme and to protect the integrity of these mass-marketing

41

means.  *United States v. Fredette*,  315 F.3d 1235, 1244 (10th Cir.), *cert. denied*, 538 U.S. 1045 (2003).  The defendants placement of Midwest advertisements in newspapers around the nation constitutes mass-marketing intended to induce Medicare beneficiaries to purchase durable medical equipment from Midwest as part of a scheme to defraud Medicare and the beneficiaries through upcoding.

The mass-marketing enhancement was added to the Sentencing Guidelines in amendments that became effective November 1, 1998.  U.S.S.G. App. C, Vol. II, amend. 577 (2003).  The defendant Frank Heck objects that the application of this enhancement essentially would violate the Ex Post Facto Clause. A sentencing court generally applies the Guidelines Manual effective on the date of sentencing unless their application would violate the Ex Post Facto Clause of the United States Constitution.  *United States v. Svacina*, 137 F.3d 1179, 1186 (10th Cir. 1998).  "The Ex Post Facto Clause is violated if the court applies a guideline to an event occurring before its enactment, and the application of that guideline disadvantages the defendant 'by altering the definition of criminal conduct or increasing the punishment for the crime.'"  *Id*. (quoting *Lynce v. Mathis*, 519 U.S. 433, 441 (1997)).  If a conspiracy commences under one set of Guidelines and continues operating into the effective period of the Guideline amendments, "there is no violation of the ex post facto clause in applying the Guidelines in effect at the

42

time of the last act of the conspiracy." *United States v. Stanberry*, 963 F.2d 1323, 1327 (10th Cir. 1992) (citing in part *United States v. Shewmaker*, 936 F.2d 1124, 1130 (10th Cir. 1991), *cert. denied*, 502 U.S. 1037 (1992)).  Because the evidence at trial proves that the defendants committed acts in furtherance of the conspiracy to defraud after November 1, 1998, it is immaterial to the proper application of this enhancement whether the defendants continued to engage in mass-marketing after that date.  *See United States v. Cassidy*, 48 Fed. Appx. 428, 446, 2002 WL 2022520 at *13 (4th Cir. 2002).

The court sustains the government's objection and will apply the mass-marketing enhancement.

**Government's Objection to Omission of Sophisticated Means Enhancement**

The government objects that the PSR fails to recommend a two-level enhancement pursuant to U.S.S.G. § 2F1.1(b)(5)(C) for sophisticated means.  The government alleges the sophisticated means used to perpetrate and conceal the defendants' fraud includes the falsification of numerous documents, use of billing companies, use of sales persons, hiring inexperienced and submissive staff, duping physicians to sign certificates of medical necessity, exploiting Medicare beneficiaries' desires for power wheelchairs, exploiting the vulnerability of the Medicare system, concealing the true owners from Invacare, laundering proceeds

43

to prevent Invacare from seizing accounts payable, and making repeated false

statements to Invacare.  The defendants oppose this enhancement denying that the

allegations of fraud on which they were convicted entail sophisticated means.

> **Ruling**:  The discussion in application note 15 lays out the intended

parameters for this enhancement:

> For purposes of subsection (b)(5)(C), "sophisticated means" means
> especially complex or especially intricate offense conduct pertaining to the
> execution or concealment of an offense.  For example, in a telemarketing
> scheme, locating the main office of the scheme in one jurisdiction but
> locating soliciting operations in another jurisdiction would ordinarily indicate
> sophisticated means.  Conduct such as hiding assets or transactions, or
> both, through the use of fictitious entities, corporate shells, or offshore bank
> accounts also ordinarily would indicate sophisticated means.

In short, the intent of this enhancement is to punish the more cunning and scheming

defendants who employ complex and involved means so as to avoid or delay being

found out.  Thus, this enhancement should be reserved for those defendants who

employ more complex or intricate means than those typically used in an ordinary

Medicare fraud scheme.  *Cf. United States v. Montano*, 250 F.3d 709, 714-15 (9th

Cir. 2001).

As summarized above, the government offers a litany of what it argues

are sophisticated means.  Most of the examples require an independent finding of a

fraudulent intent sweeping through the defendants' entire business, some seem to

44

be nothing more than common business practices of durable medical equipment providers, and others fall into the category of means used in ordinary Medicare fraud cases.  Just as it did in prior sections of this order, the court rejects government's arguments for finding that the defendants' fraud permeated nearly every aspect of Midwest's business.  The court remains convinced that the defendants were careless and inexperienced business people whose greed for greater profit margins began their quick descent into criminal fraud.  Their method of upcoding was hardly sophisticated, and the evidence at trial did not prove that their decision to use billing companies was related to the upcoding.  As evidenced by their decision to sign personal guaranties for Midwest's debt, the defendants' dealings with Invacare were not sophisticated.  The government's objection is overruled.

**Government's Objection to Omission of Obstruction of Justice Enhancement**

The government argues that all three defendants should receive this enhancement for committing perjury in their trial testimony.  For each defendant, the government cites portions of his or her trial testimony and says each portion was contradicted by exhibits or testimony from other witnesses.  The defendants have not responded to the government's objections.

45

**Ruling**:  Perjury, in the context of § 3C1.1, occurs when "a witness testifying under oath or affirmation . . . gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory."  *United States v. Hawthorne*, 316 F.3d 1140, 1145 (10th Cir.) (quoting *United States v. Dunnigan*, 507 U.S. 87, 94 (1993) (citing the federal perjury statute, 18 U.S.C. § 1621)), *cert. denied*, 540 U.S. 884 (2003).  It is well established that a criminal defendant has a right to testify, but that right does not include the right to commit perjury.  *LaChance v. Erickson*, 522 U.S. 262, 266 (1998).  "An automatic finding of untruthfulness, based on the verdict alone, would impinge upon the constitutional right to testify on one's own behalf."  *United States v. Markum*, 4 F.3d 891, 897 (10th Cir. 1993) (citation omitted).  Thus, not every defendant who takes the stand and is later convicted deserves a § 3C1.1 enhancement.  *Hawthorne*, 316 F.3d at 1145 (citing *Dunnigan*, 507 U.S. at 95).  For example, the court should deny an enhancement when the defendant gives inaccurate testimony caused by "confusion, mistake or faulty memory" or when a defendant testifies about "'matters such as lack of capacity, insanity, duress, or self-defense" and the jury simply finds "'the testimony insufficient to excuse criminal liability or prove lack of intent.'"  *Id*. (quoting *Dunnigan*, 507 U.S. at 95).

In imposing a contested enhancement based upon perjury of trial

46

testimony, the sentencing "'court must review the evidence and make independent findings necessary to establish a willful impediment to or obstruction of justice, or an attempt to do the same,'" using the perjury definition furnished in *Dunnigan*. *Id*. (quoting *Dunnigan*, 507 U.S. at 95). The Supreme Court offers that "it is preferable for a district court to address each element of the alleged perjury in a separate and clear finding" but that a general finding encompassing the different elements will suffice when the trial record offers so many instances of contradicted testimony that the defendant could not have been just confused or mistaken at trial. *Dunnigan*, 507 U.S. at 95-96. The Tenth Circuit requires more for this enhancement, namely an explicit finding of at least the substance of the defendant's perjurious testimony. *Hawthorne*, 316 F.3d at 1146.

       The court finds that Terence Cooper testified falsely about the advice he received from Invacare sales representative, Mark Hill, in the fall of 1997 about the proper coding of the Power 9000 wheelchairs as K12. Hill testified that he met with the defendants at their office in the fall of 1997 and told them it would be upcoding to bill the Power 9000 wheelchairs as K11 instead of K12. The defendant Cooper first testified that Hill told them in the fall of 1997 to call Invacare headquarters about the proper coding of the wheelchairs and that during their call they were told by someone employed by Invacare to bill the Power 9000

wheelchairs as K11.  (Dk. 341 at pp. 139-41).  Cooper also testified that Hill never told him in the fall of 1997 to bill the Power 9000 wheelchairs as K12.  (Dk. 341 at p. 241).  Cooper's false testimony concerns the material issue of his knowledge of the proper codes and of his direct responsibility for the upcoding.  Cooper acted willfully in falsely denying that Hill advised him on the proper coding of Invacare wheelchairs.

The court also finds that the defendant Frank Heck falsely testified denying Mark Hill had told him that the Power 9000 and P7E wheelchairs should be coded as K12, that Midwest was using the wrong codes for these wheelchairs, and that Midwest was upcoding these wheelchairs.  Frank Heck also falsely denied saying to Hill that because of the commissions paid its sales representatives Midwest could not afford the lower profit margins that came with buying the more expensive models that carried the higher codes.  Frank Heck's testimony in this regards goes to the material element of his knowledge of the upcoding of wheelchairs and divulges a material motive for risking such criminal conduct.  The court is convinced that the defendant acted willfully in providing this false testimony.

The court finds that the defendant Paige Heck falsely testified denying that Mark Hill had told her that the Power 9000 and P7E wheelchairs should be

coded as K12.  As with the other defendants, this testimony goes to the critical

element of her knowledge that the wheelchairs were being upcoded.  The court

finds that the defendant acted willfully in providing this false testimony.

Based on these findings, the court imposes two-level enhancements

for obstruction of justice to each of the defendants for falsely denying they had

been told by Mark Hill, Invacare's sales representative, about the proper codes to

use for the Power 9000 and P7E wheelchairs.

**Government's Objection to the Omission of Laundered Funds Enhancement**

The government objects that the PSR fails to recommend a two-level

enhancement pursuant to U.S.S.G. § 2S1.2(b)(1)(B).  The defendants do not

respond to this objection.

**Ruling**:  This guideline requires an enhancement for a section 1957 violation

"if the defendant knew that the funds were not merely criminally derived, but were

in fact the proceeds of a specified unlawful activity."  U.S.S.G. § 2S1.2, comment.

(backg'd.); *see also United States v. Lowder*, 5 F.3d 467, 473 (10th Cir.1993).

The defendants were charged and convicted with laundering proceeds from health

care fraud and conspiracy to commit health care fraud.  Health care fraud and

conspiracy to commit health care fraud qualify as "Federal health care offenses"

specified in 18 U.S.C. §  1956(c)(7)(F).  The evidence at trial fully established that

49

the defendants knew the proceeds were not merely criminally derived but were the result of their unlawful upcoding. The court sustains the government's objection.

**Government's Objection to Frank Heck's Criminal History Category**

The PSR for Frank Heck correctly scores two criminal history points pursuant to U.S.S.G. § 4A1.1(c) for the convictions described in paragraphs 323 and 324 and accordingly recommends a criminal history category of two. Paragraph 359 mistakenly reports that the defendant's criminal history category is one, and the court sustains the government's objection to the error appearing in that paragraph.

**Defendants' Objection to the Enhancement Pursuant to U.S.S.G. § 2F1.1(b)(2)**

The defendant Cooper objects to this enhancement disputing the proof of more than minimal planning, the defendant Paige Heck objects that its application violates *Booker* and *Blakely*, and the defendant Frank Heck does not object to the enhancement.

**Ruling**: Section 2F1.1(b)(2) creates a two-level enhancement for an offense involving "(A) more than minimal planning, or (B) a scheme to defraud more than one victim." The defendant Cooper does not object to the PSR's finding at ¶ 300 "that there is more than one victim in this matter." The court determines that no

50

ruling on the defendant Cooper's objection is necessary because this enhancement

remains fully applicable based on the number of victims.  *See* Fed. R. Crim. P.

32(i)(3)(B).  Prior sections of this order address the defendant Paige Heck's

objections on *Blakely* and *Booker* grounds.  The defendants' objections to this

enhancement are overruled.

**Defendants' Objections to Role Enhancement**

The PSR recommends that all three defendants receive two-level

enhancements as organizers or leaders based on their respectively significant and

essential roles in Midwest's business.  The defendant Cooper argues that the

government alleged and argued that the defendants were equally culpable and that

the defendants' employees were not criminally liable.  Thus, Cooper challenges that

he was not the organizer, leader, manager, or supervisor of any other criminally

responsible participant for purposes of U.S.S.G. § 3B1.1(c).  The defendant Frank

Heck generally denies that he qualifies as a leader and argues the evidence fails to

prove that he recruited accomplices, received a larger share of profits, participated

or planned more than his co-defendants, or exercised greater control over

employees than his co-defendants.  The defendant Paige Heck contends her co-

defendants were responsible for the decisions related to coding and billing and

denies involvement in those matters.  She emphasizes testimony from former

51

Midwest employees that Paige Heck instructed them to do what was right and comply with Medicare regulations. She also argues that this testimony combined with the jury's verdict finding her not guilty of seven counts (five of the twelve health care fraud counts and two of the fourteen money laundering counts) justifies a mitigating role adjustment.

**Ruling**: "If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by 2 levels." U.S.S.G. § 3B1.1(c). The burden of proving this enhancement by a preponderance of the evidence rests with the government. *United States v. Anderson*, 189 F.3d 1201, 1211 (10th Cir. 1999). The PSR recommends the enhancement based on a finding of either a leader or organizer. This enhancement is intended to address "either the exercise of control over other participants or the organization of others for the purpose of carrying out the crime." *United States v. Tagore*, 158 F.3d 1124, 1131 (10th Cir. 1998) (citations omitted). "There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy." U.S.S.G. § 3B1.1, comment. (n. 4); *see United States v. Knox*, 124 F.3d 1360, 1364 (10th Cir. 1997).

Courts should weigh and consider facts bearing on "the exercise of decision making authority, the nature of participation in the commission of the

52

offense, the recruitment of accomplices, the claimed right to a larger share of the

fruits of the crime, the degree of participation in planning or organizing the offense,

the nature and scope of the illegal activity, and the degree of control and authority

exercised over others." U.S.S.G. § 3B1.1, comment. (n. 4); *see United States v.*

*Baez-Acuna*, 54 F.3d 634, 638-39 (10th Cir. 1995). These are only factors to

consider, "and the guidelines do not require that each be satisfied for § 3B1.1 to

apply." *United States v. Lacey*, 86 F.3d 956, 967 (10th Cir.) (citation omitted),

*cert. denied*, 519 U.S. 944 (1996). "In considering these factors, the sentencing

court should remain conscious of the fact that the gravamen of this enhancement is

control, organization, and responsibility for the actions of other individuals because

§ 3B1.1(a) is an enhancement for organizers or leaders, not for important or

essential figures." *United States v. Anderson*, 189 F.3d at 1211 (quoting *United*

*States v. Torres*, 53 F.3d 1129, 1142 (10th Cir.), *cert. denied*, 515 U.S. 1152

(1995)).

   The enhancement applies to one serving as an organizer in "devising a

criminal scheme, providing the wherewithal to accomplish the criminal objective,

and coordinating and overseeing the implementation of the conspiracy." *United*

*States v. Valdez-Arieta*, 127 F.3d 1267, 1272 (10th Cir. 1997). "'An organizer

arranges a number of people engaged in separate activities into an essentially

53

orderly operation.'"  *United States v. Hutching*, 75 F.3d 1453, 1458 (10th Cir.)

(quoting *United States v. Smith*, 24 F.3d 1230, 1233 (10th Cir.), *cert. denied*, 513

U.S. 905 (1994)), *cert. denied*, 517 U.S. 1246 (1996).  "It is not necessary to find

the defendant exercised control over other participants to qualify for an organizer

enhancement."  *United States v. Tagore*, 158 F.3d at 1131 (citing *United States v.

Valdez-Arieta*, 127 F.3d at 1272).

       The evidence at trial was replete with proof that the defendants,

Terence Cooper, Frank Heck and Paige Heck, held roles as organizers and leaders

in the conspiracy to commit health care fraud through upcoding.  Their own

testimony establishes the decision-making authority that each held and exercised

individually and jointly in planning and organizing others to carry out the scheme for

upcoding the wheelchairs and cushions.  In addition, there was convincing

testimony at trial from former Midwest employees who said they knew wrong

codes for wheelchairs and cushions were being used and even had confronted the

defendants about this practice being wrong.  The government's opinion on the

criminal responsibility of these former Midwest employees does not prevent the

court from finding they meet the definition of participant under the guidelines.  For

these reasons, the defendants' objections to the role enhancements are overruled.

       The other objection concerning role in the offense is the defendant

Paige Heck's request for a role reduction pursuant to U.S.S.G. § 3B1.2. This guideline provision "provides a range of adjustments for a defendant who plays a part in committing the offense that makes him substantially less culpable than the average participant." U.S.S.G. § 3B1.2, comm. (backg'd). The court's inquiry must "focus upon the defendant's knowledge or lack thereof concerning the scope and structure of the enterprise and of the activities of others involved in the offense." *United States v. Calderon-Porras*, 911 F.2d 421, 423-24 (10th Cir. 1990). The defendant has the burden of proving her minor participation. *United States v. Harfst*, 168 F.3d 398, 401-02 (10th Cir. 1999).

A defendant does not earn a role reduction under § 3B1.2 "simply because [s]he is the least culpable among several participants in a jointly undertaken criminal enterprise." *United States v. Lockhart*, 37 F.3d 1451, 1455 (10th Cir. 1994) (citing *United States v. Caruth*, 930 F.2d 811, 815 (10th Cir. 1991)). Though a defendant may be "comparatively less culpable than" her cohorts in crime, a court also must look at whether when the defendant was actively engaged in the criminal enterprise, was compensated for her involvement, and knew or understood "the scope and structure of the enterprise and . . . the activities of others." *Id*. In doing so, the court compares the "defendant's conduct with that of others in the same enterprise, but also with the conduct of an average participant

55

in that type of crime." *United States v. Caruth*, 930 F.2d at 815.  In short, a role

reduction is appropriate only when the defendant is "substantially less culpable"

than an average participant and not required just because multiple participants with

differing levels of culpability are involved.

       The defendant Paige Heck has not carried her burden of proving she is

entitled to a minor role reduction.  From all the evidence at trial, including her own

testimony, the court finds that Paige Heck participated actively in the administration

of Midwest's business, appeared to possess decision-making authority equal to

that of her co-defendants, knew generally about the coding practices being

followed and discussed them with the co-defendants and others, concurred with

coding practices as explained to her, and financially benefitted from Midwest's

unlawful coding practices.  On the other side of the scale, Paige Heck was not

directly responsible for the billing, she told the employees under her supervision to

comply with Medicare regulations, and was acquitted by the jury on some counts.

While it certainly believes Ms. Heck is less culpable than her co-defendants, the

court cannot find under the terminology and definitions employed in the Guidelines

that she is "substantially less culpable" than the average participant in this offense,

as she knew about the unlawful practices, did not use her authority to stop them,

and financially benefitted from them.  Paige Heck's request for a role reduction is

denied.

## SUMMARY OF GUIDELINE CALCULATIONS

As the most applicable guideline for the conspiracy conviction in count one, U.S.S.G. § 2X1.1 directs reliance on the guideline provisions governing the substantive offense.  The guideline provision for fraud is § 2F1.1 which also governs counts two through fifteen.  Thus, counts one through fifteen are grouped pursuant to § 3D1.2(d) and subject to the terms of § 2F1.1.  Counts sixteen through twenty-nine are grouped separately as required by *United States v. Hargus*, 128 F.3d 1358, 1364 (10th Cir. 1997), *cert. denied*, 523 U.S. 1079 (1998), and are subject to the terms of § 2S1.2.

Counts 1–15 Group–Offense Level Calculations–Conspiracy/Fraud

| | |
|---|---|
| –Base offense level from § 2F1.1(a) | **6** |
| –Specific Offense Characteristic for a total fraud loss of approximately $1.4 million (health care fraud loss of $803,716.02 and wire fraud loss of $600,000) § 2F1.1(b)(1)(L) | **11** |
| –Specific Offense Characteristic for a scheme to defraud more than one victim § 2F1.1(b)(2)(B) | **2** |
| –Specific Offense Characteristic for Mass Marketing § 2F1.1(b)(3) | **2** |
| –Adjustment for Leader or Organizer § 3B1.1(c) | **2** |

57

–Adjustment for Obstruction of Justice § 3C1.1                    **2**

–Adjusted Offense Level                                          **25**

Counts 16–29 Group–Offense Level Calculations–Money Laundering

–Base offense level from § 2S1.2                                 **17**

–Specific Offense Characteristic for value of laundered funds
　　of $803,716.02  § 2S1.2(b)(2) and § 2S1.1(b)(2)(E)           **4**

–Specific Offense Characteristic for knowing funds were
　　health care fraud proceeds § 2S1.2(b)(1)(B)                  **2**

–Adjustment for Leader or Organizer § 3B1.1(c)                   **2**

–Adjustment for Obstruction of Justice § 3C1.1                   **2**

–Adjusted Offense Level                                          **27**

Greater Adjusted Offense Level                                   **27**

Multiple Count Adjustment                                        **2**

Total Offense Level                                              **29**

CRIMINAL HISTORY CATEGORY (Cooper & P. Heck)                     **I**

GUIDELINE RANGE (Months)                                  **87 to 108**

CRIMINAL HISTORY CATEGORY (F. Heck)                             **II**

GUIDELINE RANGE (Months)                                  **97 to 120**

**RESTITUTION**

58

The last group of objections to the PSRs concerns the matter of restitution. The government objects that Invacare is not identified as a victim and that the court should order the defendants to be jointly and severally liable for a total loss of $7,834.138.44. The defendants object to a restitution amount in excess of the actual net loss, and Paige Heck submits no restitution should be ordered for those counts of which she was acquitted.

**Ruling**: To the listing of Invacare as a victim, the court sustains the government's objection and will add it to the list of victims. In determining the amount of restitution, the court has considered the following. It is uncontroverted that this case is subject to the Mandatory Victims Restitution Act ("MVRA"), 18 U.S.C. §§ 3663A-3664, which makes restitution a mandatory part of the defendants' sentences. A court must award "the full amount of each victim's losses . . . without consideration of the economic circumstances of the defendant." 18 U.S.C. § 3664(f)(1)(A). The government bears the burden of proving the amount of loss, and the court is to resolve any disputes over the amount of loss by a preponderance of the evidence. 18 U.S.C. § 3664(e).

"A restitution order must be based on actual loss." *United States v. Quarrell*, 310 F.3d 664, 680 (10th Cir. 2002) (citation omitted). A restitution order must account for any benefits received by the victim and limit restitution to the

59

actual losses. *See* 18 U.S.C. § 3663A(b); *United States v. Guthrie*, 64 F.3d 1510, 1516 (10th Cir. 1995). Restitution is limited to "only those actual losses . . . directly related to and proximately caused by the" defendant's commission of the offense of conviction. *United States v. Sundstrum*, 221 F.3d 1354, 2000 WL 1005267, at *2 (10th Cir. 2000); *see United States v. Brewer*, 983 F.2d 181, 183-84 (10th Cir.), *cert. denied*, 508 U.S. 913 (1993); 18 U.S.C. § 3663A(a)(2). If the offense of conviction included "as an element a scheme, conspiracy or pattern of criminal activity," then restitution may compensate "any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." 18 U.S.C. § 3663A(a)(2). Because "[a] conspiracy participant is legally liable for all reasonably foreseeable acts of his or her coconspirators in furtherance of the conspiracy," a court may order restitution of "the losses caused by the entire conspiracy, not just the losses caused by those acts committed by the defendant." *United States v. Brewer*, 983 F.2d at 185; *see also United States v. Osborne*, 332 F.3d 1307, 1314 (10th Cir. 2003); *United States v. Nichols*, 169 F.3d 1255, 1278 (10th Cir.) ("[A] criminal defendant who participates in a conspiracy is liable in restitution for all losses flowing from that conspiracy.") (quotation and citation omitted)), *cert. denied*, 528 U.S. 934 (1999). "[A] district court may order a restitution amount for the relevant conduct of others that may be attributed to" the

60

defendant.  *United States v. Osborne*, 332 F.3d at 1314 (citation omitted).

Echoing its prior analysis, discussion and findings used in the actual

loss calculations under the sentencing guidelines, the court adopts those

calculations and orders restitution in the same amounts.  These calculations

represent the actual losses directly related to and proximately caused by the

defendants' commission of the offenses of conviction.  These actual losses flow

from and were caused by the entire conspiracy such that all three defendants are

jointly and severally liable for the total amount of loss.  Thus, the court orders

restitution in the amount of $642,972.82 for the Centers of Medicare and Medicaid

Services and $600,000 for Invacare Corporation.  At the time of sentencing, the

court will specify a payment schedule for restitution.

## POST-*BOOKER* DISCRETIONARY REGIME

After *Booker*, sentencing courts no longer mandatorily apply the

guidelines but rather consult them and "take them into account" along with the other

factors set forth in 18 U.S.C. § 3553(a) when sentencing.  The discretion of

sentencing courts is now not restricted to fashioning sentences within the Guideline

ranges.  *United States v. Gonzalez-Huerta*, 403 F.3d at 731.  Sentencing courts

still must determine first the appropriate sentencing range under the Guidelines and

make the factual findings necessary to that determination.  *United States v. Serrata*,

425 F.3d 886, 920 (10th Cir. 2005).  If after considering this range and the other

factors described in 18 U.S.C. § 3553(a), a sentencing court decides on a sentence

that is outside the range under the Guidelines, then it must explain its reasons for

the departure, as required by 18 U.S.C. § 3553(c)(2).  *See United States v.*

*Serrata*, 425 F.3d at 920.  In short, sentencing "courts are still required to consider

Guideline ranges, which are determined through application of the preponderance

standard, just as they were before. The only difference is that the court has latitude,

subject to reasonableness review, to depart from the resulting Guideline range."

*United States v. Magallanez*, 408 F.3d at 685 (citations omitted).

      A sentencing court must consider the following factors under §

3553(a):  the nature and circumstances of the offense; the history and

characteristics of the defendant; the need for the sentence imposed to reflect the

seriousness of the offense, provide just punishment, afford adequate deterrence,

protect the public, and provide the defendant with needed correctional treatment;

the sentencing range established under the applicable Sentencing Guidelines; the

pertinent policy statements; the need to avoid unjustified sentence disparities among

defendants with similar criminal histories and found guilty of similar conduct; and

the need to provide restitution.  *See United States v. Contreras-Martinez*, 409 F.3d

1236, 1242 n.3 (10th Cir. 2005).  To the extent there is tension or incongruity

62

among the statutes and guidelines about these sentencing factors and their

consideration, the significance of it after *Booker* "diminishes as sentencing judges

are encouraged to exercise their discretion." *United States v. Serrata*, 425 F.3d at

919. These "'sentencing factors articulated in § 3553(a), which the mandatory

application of the Guidelines made dormant, have a new vitality in channeling the

exercise of sentencing discretion.'" *United States v. Delacruz-Soto*, 414 F.3d

1158, 1166-67 (10th Cir. 2005). The courts in sentencing need not expressly

consider "individually each factor listed in § 3553(a) before issuing a sentence," nor

must they "recite any magic words to show" they were "mindful" of these factors.

*United States v. Contreras-Martinez*, 409 F.3d 1236, 1242 (10th Cir. 2005).

      *Nature and Circumstances of the Offense.* This health care fraud

case is unique in several regards. First, the manner in which the defendants set up

and operated their business is hardly typical of those whose principal goal is to

defraud customers and the government. The defendants started their business

where they and their family had been raised and lived. They hired employees, some

of whom were experienced in this field. They also brought in other family members

to work for them. They invested their own money and even signed personal

guaranties in an effort to keep their operations in business. They retained billing

companies and looked to them for advice and consultation. They communicated

with manufacturers in an effort to determine the product billing codes.  They

exposed their business books and practices to screening and review by a third

party, Sunrise Medical.  They sought and received legal advice about operating

their business and even applied for separate financing to satisfy their long-term debt

obligations.  On the paperwork submitted to the billing companies, they plainly

identified the actual products sold, and they received Medicare payments for nearly

two years despite the erroneous codes.  The defendants invested their earnings into

purchasing and starting up other businesses, such as a video rental store and a

fitness club.  Such business decisions and conduct lack the surreptitious, transient

and suspicious character more typical of fraudulent business schemes.

            As was made quite evident at trial, Medicare's regulation of this field is

complex, confusing, and arguably incoherent at times.  The defendant Cooper calls

the court's attention to two recent reports regarding Medicare's reimbursement of

power wheelchairs that are relevant insofar as the defendants' improper coding of

the Power 9000 as K11 or K10, instead of the lower reimbursement code of K12.[15]

---

[15]"A Comparison of Prices for Power Wheelchairs in the Medicare
Program," Dept. of Health and Human Services, Office of Inspector General, April
2004 (OEI–03–02–00460); "Medicare Payments for Power Wheelchairs," Dept. of
Health and Human Services, Office of Inspector General, April 2004
(OEI–03–02–00600).

These reports contain several noteworthy findings and conclusions.  A wide variety of models of power wheelchairs are reimbursed under the single code of K11, and in 2002, 97% of  Medicare's payments towards power wheelchairs were for those coded K11.  In fact, the defendants aptly observe that what they made in coding the Power 9000 as a K11 was not out of line with the lawful profit margin determined under the median Medicare reimbursement rate and the median supplier cost for a K11 as reported.  The government report recommended changing the coding system to account for wheelchair variety and prices.  The other report researched a sample of K11 reimbursement claims and found that most claims did not meet Medicare's coverage criteria.  The reports plainly demonstrate that Medicare's regulatory shortcomings contribute to the practices endemic to this industry.  While these circumstances do not legally excuse the defendants' criminal conduct, they are a contributing factor to the grey areas in compliance and reimbursement and, more importantly, a relevant context in which to evaluate the defendants' knowledge and understanding of their business, the motives behind their initial business decisions, and the seriousness of their criminal activity.

It is the court's judgment that the defendants' billing practices, at least in the beginning, were largely due to their own lack of knowledge and experience in this field, to the advice they were wrongly given or misunderstood, and to their

poor judgment in recognizing and handling their responsibilities as providers in a heavily-regulated industry. Of course, from the beginning, the defendants cut corners on their compliance with Medicare requirements giving themselves the benefit of almost every doubt existing by reason of their own limited knowledge and interpretation of those requirements. Over time from their own experience in the field and through contact with others obviously more knowledgeable of and directly involved with such matters, the defendants learned they were incorrectly coding wheelchairs and cushions, and they did not stop. Reluctant to change and to accept the lower profit margins, they ignored the truth and continued to upcode but now with the knowledge and intent to defraud. Thus, the court believes that the offense levels as calculated under the Guidelines overstates the seriousness of the defendants' criminal intent and offenses and that the sentence should be accordingly fashioned to reflect these circumstances. Finally, the evidence at trial showed that Paige Heck was less responsible for the coding decisions and that she frequently stressed to the co-defendants and other employees the need for complying with Medicare requirements. Consistent with this evidence, the jury acquitted Ms. Heck of five health care fraud counts and of two money laundering counts.

*History and Characteristics of the Defendants.* After *Booker*,

66

sentencing courts have a renewed freedom to consider this sentencing factor.  Prior to the offenses in question, all three defendants maintained lawful continuous employment and financially supported their families.  None of them have been prosecuted or accused of prior fraudulent conduct.  All three defendants have fully complied with the conditions of pretrial release.

Terence Cooper

He is married with two young children, and as the record demonstrates he has a supportive extended family.  Due to his conviction and impending sentence, the defendant's employment opportunities are limited, so his wife now works full time and Mr. Cooper cares for their children at home, but he is otherwise employable.  Terence's personal family relationships have grown closer and stronger while he has endured this prosecution.  He has no criminal history.  He is actively involved in a church.  Mr. Cooper has submitted numerous letters from family and friends vouching to his good character.  In short, Mr. Cooper's history and personal characteristics, in particular the harm to his family, the strong support of his extended family and the absence of any criminal history, mitigate against the substantial sentence calculated under the guidelines.

Frank Heck

Mr. Heck recently separated from his wife, and he has two young

children.  He served in the United States Marine Corps for over four years until he was medically discharged for a leg injury.  Mr. Heck's criminal history is limited to two prior misdemeanor convictions involving conduct not indicative of the convictions on which he is now being sentenced.  Letters from family, friends and business acquaintances attest to Frank's good character and to the love and support he enjoys from his family.  Mr. Heck's history and personal characteristics weigh against a sentence longer than five years.

<u>Paige Heck</u>

Ms. Heck is a 64-year-old female, and this is her first criminal conviction.  She obtained a nursing degree in 1962 and worked as a nurse for over fifteen years before selling life and health insurance with her husband for over a decade and then went into the durable medical equipment supply business with the other defendants.  She and most of her immediate family have spent their lifetimes in the eastern Kansas area.  She is actively involved in the lives of her family, community, and church.  She has impressed others as someone of good character who is genuinely concerned with doing the right thing.  Considering Ms. Heck's age, employment history, and other personal characteristics, a sentence in excess of three years imprisonment would be unreasonable.

*Sentencing Goals and Needs:  Seriousness of the Offense, Just*

68

*Punishment, Adequate Deterrence, Public Protection, and Correctional*

*Treatment.*  As applied to this case, these sentencing purposes counsel definite

periods of incarceration, but sentences that are shorter than the sentencing ranges

recommended by the Guidelines.  It should go without saying then that the statutory

maximum sentences advocated by the government are plainly greater than

necessary to comply with these sentencing purposes.  While the loss figures

generated by the government overstate the seriousness of the offense, they cast an

impressive shadow.  The amounts of loss and the aggravating factors reflected in

the Guideline enhancements connote intermediate terms of incarceration, and such

sentences fairly fit these crimes of conviction.  Based on its personal impression of

the defendants, the court believes there is little possibility of them repeating their

offenses or posing a threat to public safety.  The general deterrence of the kind of

criminal conduct being punished here requires imprisonment, particularly to offset

the financial gains from upcoding and to promote respect for the law on billing

Medicare for power wheelchairs.  A sentence in excess of five years, however,

would be greater than necessary to deter avaricious business persons from

continuing billing practices they learn are unlawful.  None of the defendants present

a need for educational or vocational training.

> *Kinds of Sentences Available*.  The court is mindful that shorter

sentences, even probation, could be imposed, if the other factors and circumstances warranted such sentences.

   *Guideline Range*. Though relegating the Guidelines to an advisory or discretionary status, the Supreme Court in *Booker* expressed its hope that the new sentencing approach would "maintain[] a strong connection between the sentence imposed and the offender's real conduct-a connection important to the increased uniformity of sentencing that Congress intended its Guidelines system to achieve." *United States v. Booker*, 125 S. Ct. at 757. Apparently building on this expressed hope, the circuit panel in an unpublished opinion in *United States v. Hopkins*, 128 Fed. Appx. 51, *56 (10th Cir. Apr. 11, 2005), said "it is clear from *Booker*, 125 S. Ct. at 757, that the now-discretionary Guidelines will be a vital barometer of reasonableness on appellate review." Plainly, the Guidelines remain "important to the overall reasonableness of any sentence imposed by a court post-*Booker*," *United States v. Taylor*, 413 F.3d 1146, 1152 (10th Cir. 2005) (citation omitted), to the point of "exert[ing] gravitational pull on all sentencing decisions," *United States v. Trujillo-Terrazas*, 405 F.3d 814, 819 (10th Cir. 2005). Because the Guidelines were designed to offer a desirable uniformity in sentencing, courts should pay particular attention to the calculated sentencing range in settling on a reasonable sentence.

The court repeatedly has observed that the enhancements for the amount of loss in this case overstate the seriousness of the defendants' offenses. The base offense levels also fail to account for the money laundering activity being only rudimentary and incidental to the health care fraud offenses.  Because the amount of pecuniary loss is the driving consideration of economic offenses under the Guidelines, the court accordingly has tempered its reliance on the calculated sentencing ranges.[16]  In sentencing the defendants to intermediate terms of incarceration, the court believes it has fulfilled the Guidelines' goal of "a short but definite period of confinement for a larger proportion of . . . white collar cases."[17] Indeed, the sentences here exceed the average sentences imposed on fraud offenders largely as a result of the significant pecuniary loss.

The Guidelines do not account for the unique punishment already experienced by these defendants from this lengthy and expensive prosecution and their convictions.  All three defendants have endured personal hardships from a prosecution delayed by several years, from a trial that was hard fought, and from a

---

[16]Assuming for the sake of argument that the court had accepted the government's position on calculating loss and the other Guideline enhancements, the court would not have imposed sentences longer than the terms imposed herein because of the other sentencing factors fully discussed above.

[17]"Fifteen Years of Guidelines Sentencing," United States Sentencing Commission, p. 56 (Nov. 2004).

71

sentencing that was delayed in anticipation of *Booker* and by this court's deliberation. All three defendants were financially ruined by their business venture and the civil judgment stemming from it. Following their release from prison, their felon statuses will close some doors leading back to the business world.

> *Need to Avoid Unwarranted Sentence Disparities*. This factor addresses "disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). The court has not received evidence or arguments meeting the criteria relevant under this factor. The court believes the sentences to be imposed will not result in unwarranted sentence disparities.

> *Need to Provide Restitution*. Restitution is being ordered in this case. Consequently, the defendants' ability to pay the same will resume sooner with shorter sentences.

**IMPOSITION OF SENTENCE**

> After giving careful consideration to the Guideline sentencing range and the other factors under § 3553(a), this court determines that sentences of forty-eight months imprisonment for Terence Cooper, sixty months imprisonment for Frank Heck, and thirty-six months imprisonment for Paige Heck are sufficient to comply with purposes in § 3553(a)(2). These sentences capture the seriousness

72

and harm of the offenses without being greater than necessary.  While all three sentences are less than the calculated Guideline sentencing ranges, they are justified by the different sentencing factors identified and fully discussed above.  In fashioning these sentences, the court also took into account Terence Cooper's post-offense conduct and lack of criminal history, Frank Heck's criminal history and decision-making role, and Paige Heck's age and limited culpability.  The court believes these sentences are consistent with the persuasive weight of the evidence at trial and the sentencing hearing.  Finally, the court reasonably tailored these sentences in consideration of the unique nature of these offenses and of each defendant's circumstances.

IT IS THEREFORE ORDERED that on January 31, 2006, at 9:30 a.m., the court intends to sentence the defendant Terence Cooper to a term of imprisonment of 48 months;

IT IS FURTHER ORDERED that on January 31, 2006, at 10:00 a.m., the court intends to sentence the defendant Frank D. Heck to a term of imprisonment of 60 months;

IT IS FURTHER ORDERED that on January 31, 2006, at 10:30 a.m., the court intends to sentence the defendant Paige A. Heck to a term of imprisonment of 36 months;

73

IT IS FURTHER ORDERED that this memorandum and order shall constitute the court's determinations pursuant to Fed. R. Crim. P. 32(i)(3) and its statement of reasons pursuant to 18 U.S.C. § 3553(c).

Dated this 24th day of January, 2006, Topeka, Kansas.


s/ Sam A. Crow
Sam A. Crow, U.S. District Senior Judge